# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TONY PITTMAN and AL DEMEKE, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3174 |
| | § | |
| GENERAL NUTRITION CORP., | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

This is an employment discrimination and retaliation case, filed by Tony Pittman ("Pittman") and Al Demeke ("Demeke") against General Nutrition Corp. ("GNC") under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Pending before the Court is Defendant GNC's Motion for Summary Judgment ("Defendant's Motion") [Doc. # 103].[1] Plaintiffs have filed their own Motion for Summary Judgment on the Claim of Disparate Impact ("Plaintiffs' Motion") [Doc. # 105].[2] The Motions are ripe for adjudication. The Court has considered the parties' submissions, all matters of record, as well as applicable legal authorities. The Court concludes that Defendant's Motion for Summary Judgment should be **granted in part** and **denied in part** and Plaintiffs' Motion for Summary Judgment should be **denied**.

---

[1]     Plaintiffs have responded [Doc. # 112] ("Plaintiffs' Response"), and Defendant GNC has replied [Doc. # 116] ("GNC's Reply").

[2]     Briefing on Plaintiffs' Motion includes GNC's Response [Doc. # 114], Plaintiffs' Reply [Doc. # 115], and GNC's Surreply [Doc. # 118].

## I.   BACKGROUND AND FACTUAL RECORD

Many of the facts in this case are hotly disputed.  Plaintiffs and Defendant accuse each other not only of misconstruing key events, but of lying under oath and fabricating evidence to deceive the Court.  The following facts are drawn from the parties' submissions and are, unless otherwise described, uncontested.

GNC is a retailer of nutritional supplements such as sports nutrition products, diet products, vitamins, minerals, and specialty supplements.  Its retail stores are organized into three divisions, each of which relies on a hierarchy of managers and executives.  There are several layers of supervisors at individual stores.[3]  Above each store's local management, in order of rank, are Regional Sales Directors ("RSDs"), Divisional Sales Directors ("DSDs"), and Divisional Vice Presidents ("DVPs").   RSDs manage territories consisting of approximately two to four dozen stores.  RSDs also are responsible for the daily operations of corporate retail locations and for working with and developing their store managers for advancement.  DSDs, the next higher rung on the management ladder, are responsible for the supervision and direction of between ten and fifteen RSDs as well as corporate development on a broader scale than that of the RSDs.  GNC refers to DSDs as high-level managers entrusted with a great deal of responsibility and deems their performance "critical" to the proper execution of GNC's business plan.  Every DSD is assigned to one of three geographic divisions, each of which is headed by a DVP.  DVPs are responsible directly to GNC's corporate headquarters.

---

[3]      These include Store Managers, Senior Store Managers, and District Managers.

Plaintiffs' respective claims are intertwined, but an understanding of Demeke's claims is dependent upon knowledge of Pittman's claims and the events giving rise to them. Thus, the Court describes the facts pertaining to Pittman's claims first and then turns to matters particular to Demeke.

A.     **Pittman's "Promotion"**

Pittman worked for many years, and Demeke still works, in GNC's Division II. GNC hired Pittman as a "management trainee" in 1984.[4] He was hired as, and was, an at-will employee throughout his time with the company. In late 2001, GNC terminated all of its Division II officers except Pittman.[5] Pittman at that time had been promoted to "Division Franchise Officer," and was the most senior manager remaining in Division II. GNC tapped him to serve as Division II DVP until the position could be filled permanently.[6] Pittman's term as DVP lasted roughly six months, after which he resumed his franchising duties. In November 2002, Pittman was appointed a Division II DSD.[7]

At some point in 2003, GNC's Division II DVP stepped down and the company began searching for a replacement. A letter was sent to all the DSDs informing them that the position was open and inviting them to submit an application. Pittman did not respond. He testified at his deposition that he had just moved and was still settling into his new location

---

[4]     Deposition of Tony Pittman ("Pittman Depo."), Defendant's Motion, Exhibit B, at 61.

[5]     *Id*. at 68. The reason for the mass terminations is not part of the record.

[6]     *Id*.; Affidavit of Ron Hallock ("Hallock Aff."), DVP for Division III, Defendant's Motion, Exhibit C, ¶ 3.

[7]     Pittman Depo., at 73-74.

and new position as DSD.  The parties present vastly different narratives about the events

following this letter inviting applications.

### 1.      Pittman's Account

According to Pittman, he attended a meeting in Pittsburgh with other DSDs and

DVPs.  Present at that meeting were several high-level GNC executives, including Tom

Dowd, the Senior Vice President of Stores.  Dowd allegedly confirmed to Pittman that he

was GNC's choice for the DVP position.  Pittman asserts that GNC flew him back to

Pittsburgh on September 25, 2003, "to finalize his promotion to DVP."[8]  He recounts a

conversation he had with Eileen Scott, GNC's Senior Vice President of Human Resources,

while in Pittsburgh.  She congratulated him, he contends, and asked whom he would promote

to fill the vacancy left by his promotion.  Pittman indicated his intent to select Demeke for

the DSD slot.   According to Pittman, Scott agreed that Demeke was overdue for

advancement.   After briefly speaking to and being congratulated by Joseph Fortunato,

another GNC executive, Pittman returned to Dowd's office.  Dowd had learned from Scott

that Pittman intended to promote Demeke, and expressed disapproval.[9]  Pittman left

Pittsburgh without any offer in writing, but believed he had been promoted.  He submitted

---

[8]      Defendant's Response, at 25; *see also* Pittman Depo., at 138.

[9]      In his deposition, Pittman quoted Dowd extensively.  "[H]e said, 'I really don't—I don't think
that's—should be your best course of action.'  He said, 'I think you really should reconsider
that.'  And I said, 'Well, what are you talking about?'  He said, 'Look around you, Tony.'
He said, 'We go back a long way.'  He said, 'It's just—take a look around you.'  He said, 'It
would be in your best interest to reconsider that.'  He said, 'We don't promote those guys.
We're not going to promote that guy.'  And he said, 'You need to reconsider what you're
doing.'"  Pittman Depo., at 149.

affidavits from a fellow Division II DSD and a member of his own support staff attesting that he had called them from the Pittsburgh airport to inform them of his promotion.[10]

Ultimately, Pittman did not receive the promotion.  GNC offered the DVP position to Darryl Green, a past Division II DVP who had been terminated in 2001 for "Poor Work Performance."[11]  On October 28, 2003, Green accepted the offer and returned to GNC.

### 2.     GNC's Account

According to GNC, Dowd was uninterested in Pittman as a candidate for DVP, and only interviewed him at the behest of a senior GNC executive who believed that Pittman deserved consideration "out of respect for [Pittman's] tenure with the company."[12] According to Dowd's deposition, he and another executive interviewed Pittman in Pittsburgh but were unimpressed by his demeanor and accomplishments; Dowd denied that Pittman was offered the promotion.[13]

Scott also interviewed Pittman, and confirmed in her deposition that he "hadn't interviewed very well" with her, and that he "didn't seem prepared, he didn't seem serious."[14]  Scott did discuss Pittman's plans to promote Demeke to fill Pittman's position if he were promoted, but she characterized this as a possibility that arose during a job

---

[10]     *See* Affidavit of Ron Starcevic, Plaintiffs' Response, Exhibit 25, at Attachment N; Affidavit of Deborah Newton, *id.,* at Attachment O.

[11]     Employee Separation Report, Plaintiffs' Response, Exhibit 25, at Attachment Q.

[12]     Deposition of Michael Meyers, Defendant's Motion, Exhibit E, at 67.

[13]     Deposition of Thomas Dowd, Defendant's Motion, Exhibit D, at 170.

[14]     Affidavit of Eileen Scott, Plaintiffs' Motion, Exhibit G, at 34.

interview rather than a concrete plan set down following a job offer.[15]   A month or so afterward, Scott interviewed Green.  Scott explained that Green had originally been fired due to "a personality conflict with the senior vice president of marketing and retail sales," and that he "interviewed very well" for the position in 2003.[16]

GNC denies that anyone in Pittsburgh told Pittman that he would be promoted.  GNC also denies that Pittman's intention to promote Demeke was a factor in its decision not to promote Pittman; Scott could not recall even communicating Pittman's comment regarding Demeke to Dowd or Fortunato,[17] and Dowd denied discussing the matter with Pittman.[18] GNC points to Pittman's sworn statement to the EEOC, which discusses his version of the events in Pittsburgh but omits any mention of a conversation with Dowd about Pittman's proposal to promote Demeke.[19]  Pittman's EEOC statement characterized Dowd as "nervous and upset" after Pittman explained that he planned to promote Demeke, but Pittman did not describe in that statement the details of the conversation he later included in his deposition testimony.[20]   GNC also highlights the deposition of Pittman's wife, Ann, in which she

---

[15]     *See id.* at 36.

[16]     *Id.* at 41-43.

[17]     *See id.* at 36.

[18]     *See* Deposition of Thomas Dowd ("Dowd Depo."), Defendant's Motion, Exhibit D, at 213.

[19]     *See* Statement of Discrimination Against GNC by Tony Pittman, Defendant's Motion, Exhibit H, Attachment 1.

[20]     Pittman explains in his Response that he omitted the details of the conversation from his EEOC charge because Dowd had asked that their discussion be kept private.

recounted her husband's description of his conversation with Dowd.  GNC points out that her account omits any mention of the explicit warnings Dowd supposedly gave Pittman about promoting Demeke.  Instead according to Mrs. Pittman, her husband merely characterized Dowd as "cold and distant like he suddenly had things to do."[21]

On March 18, 2004, Pittman filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that GNC "discriminated against [me] because of my race, White, and in retaliation for my recommendation to promote an African-American."[22]  Pittman asserted that he had been promoted to Division II DVP on or around September 25, 2003, and that the promotion was unlawfully rescinded on October 1.  The EEOC charge makes no mention of any harassment or discrimination other than the alleged rescission of his promotion.  The EEOC issued Pittman a Right to Sue Notice[23] and he timely filed this lawsuit jointly with Demeke on August 8, 2004.

**B.**     **Pittman's Discharge**

Pittman describes a period of harassment that followed GNC's decision to hire Green as its Division II DVP.  According to Pittman, for more than a month after DVP Green's arrival, Green called Pittman daily at 6:00 a.m. to see if he was awake and ask unimportant

---

[21]     Statement of Ann Pittman, Defendant's Motion, Exhibit I, at 31.

[22]     Defendant's Motion, Exhibit S.  *See* Charge of Discrimination No. 330-2004-02654 ("Pittman Charge"), dated March 18, 2004, Defendant's Motion, Exhibit S.

[23]     *See* Dismissal and Notice of Rights, Re: EEOC Charge No. 330-2004-02654, dated June 3, 2004, Defendant's Motion, Exhibit T.

questions about the previous day's business.[24]   Pittman asserts that his performance evaluations suffered once Green was hired and Green became aware of Pittman's grievances.[25]   Pittman claims that Dowd also harassed him by pointedly ignoring him at meetings and ordering Green to closely scrutinize Pittman's excuse for missing a particular business meeting.[26]  The alleged harassment culminated in Pittman's termination in February 2005, which he claims was in retaliation for his protected activities.   The parties again present substantially incompatible versions of the events surrounding GNC's decision to fire Pittman.

There is no dispute that GNC, as a purveyor of health foods and dietary supplements, does a large amount of business in "the January diet season."[27]  Pittman was instructed by the head office to visit Tennessee and Mississippi on December 28, 29, and 30, 2004, to review the retail locations and ensure their readiness.  Pittman explained at his deposition that the store visits were also intended to make sure that they were presentable for possible informal inspections by Jim Burns, a GNC executive, that were anticipated in January 2005.[28]  Rebecca Hout, an RSD who worked with Pittman, was scheduled to accompany him on this trip.  Hout and Pittman visited a number of stores in Tennessee, a part of "Region 1,"

---

[24]    Pittman Depo., Plaintiffs' Response, Exhibit 1, at 124.

[25]    *Id.* at 201.

[26]    *Id.* at 280-81.

[27]    Defendant's Motion, at 11.

[28]    Pittman Depo. at 213.

an area encompassing Memphis, Tennessee, and parts of Mississippi, on December 28 and 29.  Rather than proceeding on to Mississippi, however, Pittman flew back to Houston on the 29th.[29]  Pittman contends that he drove back to Vicksburg, Mississippi, with his wife, on the 30th where he continued to inspect GNC stores until the new year.

In early January 2005, GNC's employees were to submit all expense reports to the divisional office.   Pittman's report contained some unspecified omissions, so Chris Chambers, a Division II administrator, contacted Pittman. Pittman told Chambers that he had been in Region 1 on December 28, 29, and 30.[30]  This contradicted the receipts Pittman submitted with his report, which showed that he had flown back to Houston on the 29th. Pittman produced no receipts from Region 1 for December 30, even though his report claimed expenses for two meals in Region 1 on that date.  The only receipt from the 30th that Pittman produced was from a Pappasito's restaurant in Houston.

Chambers presented the December expense reports to Green, who approved them. "[W]eeks later in late January, 2005," Chambers informed Green that she had "audited the copies of the [reports] in more detail and had found some significant discrepancies" in Pittman's submission.[31]  Green then remembered a conference call he held with the Division II DSDs on December 30, in which each participant announced his or her location.  Green recalled that Pittman had reported that he was in "the Memphis market," referring to Region

---

[29]     *Id.*, Exhibit M, at 12-14.

[30]     Email from Tony Pittman to Chris Chambers, Defendant's Motion, Exhibit 1, Attachment 3.

[31]     Second Affidavit of Darryl Green ("Green Second Aff."), GNC's Reply, Exhibit 10, at ¶ 4.

1.[32]  Concerned now that Pittman had falsified an expense report and lied to his superiors, Green decided that "it was a serious enough matter that I needed to consult with HR and legal counsel," which he did on February 2, 2005.[33]  Green was aware by this time that Pittman had filed a charge with the EEOC.[34]

Also on February 2, after discussing the matter with legal counsel and Marilyn Renkey, GNC's Senior Director of Employee Relations, Green called Pittman and asked him to clarify the representations he had made to the company as to his whereabouts on December 30, 2004.[35]  Pittman responded that he was in Region 1 on December 28, 29, and 30, and that although he had flown to Houston on December 29, he was back in Region 1 on December 30.[36]  He explained that he had driven to Vicksburg, that his wife had accompanied him, and that because she was there, the drive "was as much personal as it was

---

[32]  *See* Deposition of Darryl Green ("Green Depo."), Defendant's Motion, Exhibit L, at 272 ("Mr. Pittman said – advised me that he was in the Memphis market."); Affidavit of Tom Braemer, Defendant's Motion, Exhibit N, at ¶ 3 ("When it came to Pittman, he specifically indicated that he was in Memphis."); Pittman Depo. at 214-215 (agreeing that Region 1 is the "Memphis market").  Pittman testified that he did not remember reporting that he was in Memphis, but that he was in Region 1 at the time and that Green was aware of that fact.  *See* Pittman Depo. at 237 (Green "would have known anyway what was going on.").

[33]  Green Depo., at 247.

[34]  Green testified that he learned of Pittman's EEOC charge months earlier, on July 29, 2004, when Pittman sent him documentation related to the charge.  Affidavit of Darryl Green ("Green Aff."), Defendant's Motion, Exhibit K, at 2, ¶ 5.

[35]  Green Depo., at 249.

[36]  Deposition of Marilyn Renkey, Defendant's Motion, Exhibit P, at 79.

business."[37]  Pittman explained that he had not submitted any receipts, mileage reports, or

used his company credit card for gas because he and his wife "may have inserted a few

stops" that he would otherwise not have made, although he denied visiting fewer stores than

he would have had he traveled alone.  He had no explanation at that time for an allegedly

falsified Houston restaurant receipt.[38]

Dubious of Pittman's explanations, Green asked Pittman to name the specific retail

locations he visited in Mississippi.  According to Green, Pittman asked for "a day or so" to

respond to this request, which Green felt was unacceptable because "[i]f you traveled for

nine hours one way up to Mississippi, you should pretty well know exactly where you

went."[39]  Green also directed Hout to contact the stores Pittman had been scheduled to visit.

She was able to contact only one of the managers, but although this inquiry was less than five

weeks after Pittman's alleged visit, he did not recall seeing Pittman or anyone matching his

---

[37]     Pittman Depo., at 226.

[38]     *Id*. at 226-27. Pittman later testified before the Texas Workforce Commission that he allowed
his daughter to use his credit card to buy a meal in compensation for her assistance in
inspecting some GNC stores, and that the signature on credit card receipt was hers.  *See*
Texas Workforce Commission Hearing Transcript for May 26, 2005, Defendant's Motion,
Exhibit H, Attachment 3, at 106-07.  He testified at a different Commission hearing that this
was the first time he had compensated her with a meal, and that she ate with a friend.  Texas
Workforce Commission Hearing Transcript for June 10, 2005, Defendant's Motion, Exhibit
H, Attachment 4, at 75.  GNC retained a forensic document examiner, who concluded that
Pittman, not his daughter, signed the receipt.  At his deposition, taken in December 2005,
Pittman changed his testimony and explained that his daughter gave him a copy of the receipt
after eating at the restaurant, and that he signed that receipt.  He also testified, again
contradicting his earlier statements, that this was an established routine and that she ate alone.
Pittman Depo., at 256.

[39]     Green Depo., at 250, 266-67.

description.[40]  Hout expressed her own belief that Pittman had not visited the stores, because she found it strange that he would return to Texas only to turn around and drive so far to return to Region 1.  Hout also reported that one of the stores Pittman claimed to have visited on December 30 was in such bad shape that she terminated the manager soon afterwards.  Hout added that her opinion that, had Pittman seen the condition of that store, he would have reprimanded her as the responsible RSD.  Green states he was now convinced that Pittman had forged records and deceived his superiors.  Green terminated Pittman's employment that same day, February 2, 2005.[41]

It appears that Pittman filed another EEOC charge complaining that his termination was retaliatory,[42] although neither that charge nor a Notice of Right to Sue on it are in the

---

[40]  The manager "recalled that particular day" because of the low traffic in the store.  Deposition of Rebecca Callaway-Hout ("Hout Depo."), Defendant's Motion, Exhibit M, at 28-29.

[41]  The Court describes only the portions of GNC's investigation leading up to Pittman's termination that took place shortly before he was fired.  The investigation continued after the termination.  Post-termination, GNC uncovered substantial evidence suggesting that Pittman also fabricated a motel receipt and lied about his whereabouts during the conference call.  The Court does not rely on this information to decide the summary judgment motions.

[42]  *See* "Response to GNC Proferred [*sic*] Reason for Terminating Me," Re: EEOC Charge No. 330-2005-01993, dated March 30, 2005, Plaintiffs' Response, Attachment 2.  Although Pittman's retaliatory discharge claim could theoretically be untimely, depending on when he was granted the right to sue on this charge, GNC has waived any argument on that issue by failing to raise it.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("[A] timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); *Volovsek v. Wisconsin Dep't of Agric.*, 344 F.3d 680, 686 n.3 (7th Cir. 2003) (holding that failure to contest existence of a right to sue letter was waiver); *Young v. City of Houston*, 906 F.2d 177, 180 (5th Cir. 1990) ("A failure of the EEOC prerequisite does not rob a court of jurisdiction.").

record.  In March 2005, Plaintiffs amended their complaint to include a retaliation claim based on this allegation.  *See* First Amended Complaint ("Amended Complaint") [Doc. # 33].

### C.    Demeke's Proposed Promotion

Demeke joined GNC in 1979 as a sales associate.  By 1986, he had been promoted to RSD.  His advancement with GNC stopped there.  He was not promoted to DSD, despite regular vacancies in that position.  Twenty GNC employees were promoted to DSD between 1998 and 2005, several of them simultaneously when, in 2001, all of Division II's DSDs were terminated for an unspecified reason.

The parties dispute whether Demeke ever indicated an interest in being promoted to DSD.  GNC claims that a significant part of the decision to promote an RSD is his or her expressed desire for greater responsibility, and that Demeke never articulated an interest in the DSD position.  Demeke testified, however, that he made his aspirations clear to various superiors, including Dowd, Green, and Pittman.

The parties also dispute Demeke's qualifications.  Ron Hallock, DVP of Division III, knew Demeke and believed that he managed his subordinates poorly.[43]  Dowd's opinion was that Demeke was a poor communicator, who often failed to keep GNC's upper management updated on his efforts, and did not generate new ideas for the improvement of his retail locations.  Demeke was placed in charge of GNC's operation in Houston, however, which

---

[43]    *See* Hallock Aff., Defendant's Motion, Exhibit C, at ¶ 7.

Pittman characterized as "one of the largest markets in the entire company to operate."[44] Demeke also contends that he was objectively a high-performing employee, as demonstrated by GNC's "YTD [Year to Date] Key Indicators" ("Key Indicators").[45]

Demeke contends that out of a pool of 208 RSDs employed by GNC between 1998 and 2004, only five were Black and that GNC does not employ any Black executives at or above the DSD level.[46] He attributes this circumstance to GNC's practice of not advertising openings for DSDs, of not conducting interviews of potential candidates, and of granting wide discretion to the DVPs, who select candidates for promotion. Demeke argues that the "pressures of friendship and ethnic loyalty" of Whites to Whites caused GNC's promotion process to have a disparate impact that prevents non-White employees from being considered for promotion.[47] Demeke filed a charge of discrimination on March 18, 2004.[48] There is no

---

[44]    Pittman Depo., at 100.

[45]    *Id.*; *see* "YTD Key Indicator by DSD for Year End 2003," Plaintiffs' Response, Exhibit 25, Attachment A. Plaintiffs suggest, as they did during discovery, that GNC fraudulently altered the Key Indicators documents produced during discovery. The Court, after exploring this issue during one or more pre-trial hearings, has been unpersuaded that Plaintiffs' assertion has any merit and has denied Plaintiffs' request for related sanctions. *See* Minute Entry Order for March 31, 2006 [Doc. # 78]. Nothing in the summary judgment record causes the Court to alter these findings and conclusions.

[46]    *See* Plaintiffs' Motion, at 4.

[47]    *Id.* at 13.

[48]    *See* Charge of Discrimination No. 330-2004-02660 ("Demeke Charge"), dated March 18, 2004, Defendant's Motion, Exhibit V.

Notice of Right to Sue for Demeke in the record, but Defendant does not assert that he failed to receive one or that his suit is untimely.[49]

Pittman and Demeke allege that GNC harassed, discriminated and retaliated against them both in violation of 42 U.S.C. § 1981, and that by doing so GNC intentionally inflicted emotional distress upon them. GNC has moved for summary judgment on all of Demeke's and Pittman's claims. Plaintiffs have cross-moved for summary judgment only as to Demeke's disparate impact claim.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.

---

[49]   GNC has waived any argument as to the timeliness of Demeke's suit. *See Zipes*, 455 U.S. at 393 (1982); *Volovsek*, 344 F.3d at 686 n.3; *Young*, 906 F.2d at 180. That waiver does not, however, extend to the exhaustion requirement, which is distinct from timeliness. *See Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006) (distinguishing filing deadlines, which are waivable, from exhaustion requirements, which may not be waivable);

CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

For summary judgment, the initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)). However, if the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *ExxonMobil*, 289 F.3d at 375.

If the moving party meets its initial burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted); *see Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) ("conclusory allegations, unsubstantiated

assertions, or 'only a scintilla of evidence'" are insufficient to defeat summary judgment (citing *Little*, 37 F.3d at 1075)).

In deciding whether a genuine and material fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999). The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence) (quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994)). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence

is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir.

2003).  "Rule 56 does not impose upon the district court a duty to sift through the record in

search of evidence to support a party's opposition to summary judgment." *See id.* (internal

citations and quotations omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495,

501 (5th Cir. 2005) ("'Judges are not like pigs, hunting for truffles buried in briefs.'")

(quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

## III.   ANALYSIS

### A.   Demeke's Claims

Demeke claims that GNC's facially neutral policy of not posting DSD openings or

interviewing for the position has a discriminatory disparate impact on Black employees.

Demeke and GNC each move for summary judgment on this claim.[50]  Demeke also asserts

a disparate treatment claim in that GNC directly and intentionally discriminated against him

by passing him over for promotion.

#### 1.   Disparate Impact Theory

GNC moves for summary judgment on Demeke's claim of "disparate impact," arguing

that he has failed to establish "significant disparity in the promotions of blacks to DSD

positions."[51] Defendant also argues that disparate impact claims are not cognizable under 42

U.S.C. § 1981.  It appears that Demeke, correctly, does not rely on § 1981 for his disparate

impact claim. *See Dehoyos v. Allstate Corp.*, 345 F.3d 290, 300 n.1 (5th Cir. 2003) ("In [the

---

[50]     Defendant's Motion [Doc. # 103], at 46 *et seq.*; Plaintiffs' Motion [Doc. # 105].

[51]     Defendant's Motion, at 47.

Fifth Circuit], §§ 1981 and 1982 have been confined to cases involving intentional racial discrimination, not disparate impact claims.").  To the extent Demeke may rely on § 1981, his disparate impact claim fails as a matter of law.

Demeke explicitly asserts his disparate impact claim under Title VII.  The Court concludes that Demeke failed to exhaust his administrative remedies on this disparate impact theory, and it must be dismissed.[52]  *See Pacheco*, 448 F.3d at 788.  The Fifth Circuit in *Pacheco* recently addressed the requirement that a plaintiff exhaust his administrative remedies before bringing a disparate impact claim.  In *Pacheco*, the plaintiff, an air-traffic controller, alleged that the Federal Aviation Administration's promotion procedures had a disparate impact on Hispanic employees.[53]  The court of appeals engaged in a detailed consideration of district and appellate cases from the Fifth and other circuits, and concluded that Pacheco's EEOC charge failed to present a disparate impact theory, that the EEOC therefore did not investigate that claim, and thus that Pacheco had failed to exhaust his

---

[52]     Demeke asserts that GNC waived the exhaustion defense by not raising it before summary judgment.  It is not settled in the Fifth Circuit whether exhaustion is analogous to a statute of limitations and may be waived, or is a jurisdictional limitation that may be raised at any time.  *See Pacheco*, 448 F.3d at 788 n.7.  The Court, however, need not resolve this issue, as GNC did raise failure to exhaust as an affirmative defense in its Answer to the Complaint.  *See* Answer to the Complaint [Doc. # 10], at 8.

[53]     Pacheco was a federal employee, and the exhaustion requirement in that case was imposed by 42 U.S.C. § 2000e-16(c), which is specific to federal employees.  The same exhaustion requirements apply to employees in the private sector, however.  *See Pacheco*, 448 F.3d at 788 n.6 ("the presently relevant scope of the exhaustion requirement is the same for both federal and private employees"); *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) ("All employees, private-sector or federal, alleging [discrimination under Title VII] must . . . exhaust their administrative remedies before exercising this right."); *cf. Doe v. Oberweis Dairy*, 456 F.3d 704, 712 (7th Cir. 2006) (comparing the rationale behind exhaustion requirements in federal and private sectors).

administrative remedies on that theory.[54]  Because his charge focused on disparate treatment and failed to identify facts relevant to the unique factor of disparate impact claims (*i.e.*, a neutral employment policy), the court held that "a disparate-impact investigation could not reasonably have been expected to grow out of Pacheco's administrative charge."  *Id.*

Demeke's EEOC charge is substantially similar to the charge in *Pacheco*.  Demeke asserts that "I have been denied promotions to Divisional Sales Director" and "I was never granted an interview," and that "non-Black, non-African-American individuals who possess less qualifications" were promoted instead of him.[55]  He charged that, "I believe I have been discriminated against because of my race, Black, color, Black, national origin, Ethiopian, and retaliated against," but never identified a neutral employment policy he intended to challenge.  *Id.*  On its face, Demeke's charge alleged only disparate treatment, not disparate impact.

Demeke asserts that his disparate impact claim should not be dismissed for failure to exhaust this theory before the EEOC because, even if his charge was incomplete, his reference to the procedure of "intake interview[s] and statements" was sufficient to give rise to a disparate impact investigation.  The Court does not agree.[56]  Demeke has failed to

---

[54]     Pacheco's charge was insufficient to meet exhaustion requirements on a disparate impact theory for three reasons: "(1) it facially alleged disparate treatment; (2) it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only."  *Id.* at 792.

[55]     *See* Charge of Discrimination No. 330-2004-02660 ("Demeke Charge"), dated March 18, 2004, Defendant's Motion, Exhibit V.

[56]     Demeke also argues that the investigative file was in GNC's possession but was not disclosed,
(continued...)

identify any statements or allegations that he made to the EEOC that did or should have resulted in an administrative disparate impact investigation.  Demeke's disparate impact claim must be dismissed for lack of exhaustion of administrative remedies.[57]

### 2.    Demeke's Disparate Treatment Claim

Demeke claims in connection with a disparate treatment claim that he has "direct evidence" of discrimination, pointing to Pittman's testimony that Dowd made statements indicating that GNC's management perceived that Demeke was an unsuitable candidate for promotion because of his race.

---

[56]    (...continued)
and "would have shown [how the] EEOC actual[ly] investigat[ed] the charges and what investigation could reasonably have been expected to grow out of Demeke's intake statements."  Plaintiffs' Reply, at 1-2.  This argument is unavailing.  The EEOC's file is available to a party upon request.

[57]    Demeke's reliance on *Gomes v. Avco*, 964 F.2d 1330 (2d Cir. 1994), also is unavailing.  Although the *Gomes* plaintiff did not allege disparate impact in his charge, the Second Circuit held that it was reasonable to expect that once the EEOC investigated the case, it would "question the necessity of the . . . rule itself."  *Id.* at 1335.  These circumstances are not present here.  The fact that Demeke was not given a preliminary interview would not reasonably lead the EEOC to question the propriety of GNC's policy of only interviewing its final selections for DSD promotions.  In any event, *Gomes*, a Second Circuit opinion, is not binding authority in this Circuit.

Further, it is immaterial that GNC responded to Demeke's EEOC charge that "GNC does not have a job posting policy for the retail organization," and that accordingly "any open Divisional Sales Director position is typically filled without interviews."  Response to EEOC Charge # 330-2004-02660, Plaintiffs' Motion, Exhibit 2.  While this representation may be inconsistent with GNC's alternate position that it has a written "uniform posting policy," which indicates that all openings will be posted on the corporate website, the latter policy does not require the company to conduct interviews.  Job Posting Policy, Plaintiffs' Motion, Exhibit 1, at 1.

"An employee can prove discrimination through direct or circumstantial evidence." *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994)). "If an employee presents credible direct evidence that discriminatory animus at least in part motivated, or was a substantial factor in the adverse employment action, then it becomes the employer's burden to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Id.* (citing *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993); *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Id.* (citing *Brown*, 989 F.2d at 861). "[S]tatements or documents which show on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citing *Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001)). "When a person or persons with decision making authority evinces racial animus[,] that may constitute direct evidence of discrimination." *Jones*, 427 F.3d at 993 (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004)); *see also Young v. City of Houston, Tex.*, 906 F.2d 177, 180-81 (5th Cir. 1990) ("This court has implied that calling an employee a 'nigger' would be direct evidence of race discrimination."); *Kendall v. Block*, 821 F.2d 1142, 1145-46 (5th Cir. 1987).

Demeke relies on Pittman's deposition testimony that "[Dowd] said, 'Look around you, Tony.' He said, 'We go back a long way.' He said, 'It's just—take a look around you. . . . We don't promote those guys. We're not going to promote that guy.'"[58] The Court on summary judgment must construe the evidence and make all inferences in favor of the non-movant. *Reaves Brokerage*, 336 F.3d at 412. GNC contends here that Pittman's latest version of his conversations with Dowd should not be admitted in evidence because they are contrary to Pittman's earlier sworn testimony.

It is true that Pittman's account of his conversation with Dowd has grown more elaborate with each retelling. Nevertheless, while Pittman has *added* details to his recollection of these events, GNC has not demonstrated that Pittman's current testimony actually contradicts his earlier sworn statements. Thus, the Court must consider all versions of the events in Pittman's testimony. *See and compare S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("[I]t is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."); *accord Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 385-87 (5th Cir. 2000); *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002). When an affidavit merely supplements or clarifies, rather than contradicts prior deposition testimony, a court may consider the affidavit when evaluating whether there are genuine issues in a motion for summary judgment. *S.W.S. Erectors*, 72 F.3d at 496. Further, "it is inappropriate to make credibility determinations or weigh the evidence on summary

---

[58]      Pittman Depo., at 149.

judgment." *Jones*, 427 F.3d at 993.[59] Thus, for the purposes of GNC's summary judgment motion, the Court must accept as true Pittman's latest version of his conversation with Dowd on September 25, 2003.  Accordingly, Dowd's alleged comments, albeit ambiguous, are deemed to imply racial bias and constitute direct evidence of discrimination.[60] Demeke thus raises a fact issue that GNC would not promote Demeke because of his race or national origin.  Pittman's credibility, or lack thereof, is a matter for the factfinder at trial.[61]

GNC thus is required to demonstrate that it would have passed Demeke over for promotion regardless of its management's alleged racial animus.  *Jones*, 427 F.3d at 992. GNC's alleged nondiscriminatory rationales for not promoting Demeke are that he failed to indicate his interest in a promotion, and that he did not possess the communications and people skills desirable in a DSD.[62] On the current record, there is a genuine issue of material fact as to whether GNC would have made the same decision concerning Demeke regardless of alleged discriminatory animus.  *Jones*, 427 F.3d at 992; *see also Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 666 (7th Cir. 2006).  Summary judgment is therefore not appropriate on Demeke's disparate treatment claim.

---

[59]    GNC may bring all the inconsistencies in Pittman's various accounts to the jury's attention on cross-examination.

[60]    Direct evidence of discrimination often consists of more direct opprobrium, such as racial epithets.  *See Causey*, 394 F.3d at 289 n.2 (citing examples).

[61]    Dowd's comment is an admission by a party opponent.  FED. R. EVID. 801(d)(2)(A).

[62]    *See* Defendant's Motion, at 54-55.

**B.**     **Pittman's Claims**

Pittman asserts, *inter alia*, claims of retaliatory termination, retaliatory harassment, and associational race discrimination.[63]  GNC moves for summary judgment on each of these claims.

**1.**     **Retaliatory Termination**

**a.**     **Direct Evidence Theory**

Pittman argues in support of his retaliatory termination claim that GNC terminated his employment because of his opposition to GNC's allegedly racially discriminatory policy that Black employees should not be promoted above the level of RSD, and because Pittman filed an EEOC charge and lawsuit.  In "direct evidence" cases, "once the plaintiff has submitted evidence that retaliation was among the motives which prompted the adverse action, the burden of proof shifts to the employer to establish by preponderance of evidence that the same decision would have been made regardless of the forbidden factor." *Fabela*, 329 F.3d at 415 (citing *Fierros*, 274 F.3d at 192 (internal citations and quotation marks omitted)).

Pittman relies for direct evidence of GNC's retaliatory intent on events regarding GNC's handling of his expense report for his late December business travels.  Pittman argues as direct evidence of GNC's retaliatory motive that, ordinarily, Chambers would have

---

[63]     Pittman also asserts in passing in his Amended Complaint a claim under 42 U.S.C. § 1981 that he suffered retaliation for his "advocacy" of a Black employee's, Demeke's, right to be promoted to DSD.  Pittman does not clarify what adverse actions GNC allegedly took against him for this advocacy.  The parties do not brief the issues on this claim and the Court does not reach them.

contacted him directly in an attempt to reconcile his Houston-area receipt and his travel itinerary, and that Chambers only reviewed with Pittman his itinerary, not the receipts, before going to Green.[64]

Construing the evidence in the light most favorable to Pittman and drawing all inferences in his favor, *see Reaves*, 336 F.3d at 412, Pittman fails to demonstrate any direct evidence of GNC's retaliatory motive.  Nothing about the matters cited by Pittman is "evidence which, if believed, proves the fact [of retaliatory motive] without inference or presumption."  *See Fabela*, 329 F.3d at 415 (internal citations and quotation marks deleted). Moreover, GNC has presented an uncontroverted affidavit from Green explaining that Chambers audited the expense reports of her own volition "as it was customary for her to do at the end of the month."[65]

Pittman also cites as direct evidence of GNC's retaliatory motive Dowd's statement in deposition that, having become aware of irregularities in Pittman's conduct, he (Dowd) instructed Green to "call the lawyers and find out what steps we should take, because everybody knew about the lawsuit and I wanted to make sure that everything was handled properly."[66]  Pittman's argument is unavailing.  The fact that Dowd "wanted to make sure that everything was handled properly" is not direct evidence because the evidence does not

---

[64]     Plaintiffs' Response, at 50; *see also* Affidavit of Tony Pittman ("Pittman Aff."), Plaintiffs' Response, Exhibit 26, at ¶ 7.

[65]     Second Affidavit of Darryl Green, Defendant's Reply, Exhibit 9, at ¶ 4.  *See also* Green Depo., at 240-41.

[66]     Deposition of Thomas Dowd, Plaintiffs' Response, Exhibit 6, at 219.

prove "without inference or presumption" that GNC acted with retaliatory motive when deciding to terminate Pittman's employment.  *See Fabela*, 320 F.3d at 415.  Pittman has presented no viable direct evidence that his February 2003 termination was retaliation for any alleged protected activity.

### b.      Burden-Shifting Theory

Because Pittman has no direct evidence of a retaliatory termination, "a burden-shifting construct" applies to his termination claim, similar to that used in a discrimination analysis. *See, e.g., Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005).  For a *prima facie* case, Pittman initially must show that: "1) [Plaintiff] engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action."  *Id*. (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005)).  GNC does not dispute on summary judgment that Pittman can satisfy the first two elements in this case; Pittman engaged in protected activity and suffered an adverse employment action, namely, termination of his employment.  GNC predicates its Motion on the argument that Pittman cannot establish a causal link between this protected activity and his termination.

*Prima Facie Case and Temporal Proximity*.— The parties' debate on the causal link focuses on the time span between Pittman's allegedly protected acts and his termination.  Where the only evidence of a connection between the protected activity and the adverse action is "temporal proximity," that proximity must be "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*,

237 F.3d 1248, 1253 (10th Cir. 2001)).  "Action taken . . . 20 months later suggests, by itself,

no causality at all," and cites cases finding much shorter periods insufficient to establish a

causal connection.  *Id*. at 273-74 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th

Cir. 1997) (three months is sufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th

Cir. 1992) (four months is sufficient)).  The Fifth Circuit in various unreported cases has

recently held that an employee who was fired seven months after she filed an EEOC charge

could not prevail on a claim of retaliation based solely on temporal proximity.  *See Bell v.

Bank of Am.*, 171 Fed. Appx. 442, 444 (5th Cir. 2006).  A gap of six months from the filing

of the lawsuit and eleven months from filing of the EEOC charge is also "too great to

establish retaliation based merely on temporal proximity."   *Foster v. Solvay

Pharmaceuticals, Inc.*, 160 Fed. Appx. 385, 389 (5th Cir. 2005).  *Cf. Evans v. City of

Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a span of up to four months has been

found adequate to show causal connection for summary judgment purposes)  (citing *Weeks

v. NationsBank, N.A.*, 2000 WL 341257, *3 (N.D. Tex. March 30, 2000)); *Garrett v.

Constar, Inc.*, 1999 WL 354239, *5 (N.D. Tex. May 25, 1999).

     To give Pittman the benefit due as the nonmovant on summary judgment, the Court

focuses on the protected activities closest in time to the challenged employer action, his

termination.  Pittman filed his EEOC charge on March 18, 2004, and his lawsuit on August

8, 2004.  He was fired in early February 2005.  If GNC were attributed with knowledge of

the EEOC charge and lawsuit close in time to Pittman's filings, then the temporal proximity

— eleven months from the filling of the EEOC charge (identical to that in *Foster)* and six

months from commencement of the lawsuit — likely would be insufficient to meet Pittman's *prima facie* causation requirement under *Clark County Sch. Dist.*[67]

Pittman avoids this result, however, by pointing to the dates Green learned of these filings.  It is undisputed that Green learned of the EEOC charge in July 2004, and learned about the lawsuit in "late December 2004."[68]  The Court accordingly uses these dates for the temporal proximity analysis.  Under the events as so construed, and assuming that Green (and not Dowd) was the decision-maker as to Pittman's termination, the temporal proximity of the assertion of protected rights under Title VII is sufficiently close to raise a genuine fact issue on the causation element of Pittman's *prima facie* case for retaliatory termination.[69]  *See Clark County Sch. Dist.*, 532 U.S. at 273 (under facts presented, there was no reason to believe that the employer knew of the plaintiff's protected action when employer first proposed an objectionable transfer).[70]  The Court therefore proceeds to the second stage of the burden-shifting framework.

---

[67]   The Court assumes without deciding that, given the strong overlap between Pittman's EEOC charge and his alleged comments associating himself with Demeke, that Green was aware of Pittman's September 2003 comments when he learned of the EEOC charge in July 2004.

[68]   Plaintiffs' Response, at 46; *see also* Green Aff., at 2, ¶ 5.  Neither party has provided copies of the cited pages of the Green Deposition.  *See* Plaintiffs' Response, Exhibit 5.

[69]   Pittman also asserts that *Dowd* "directed Green on when and how to proceed in terminating Pittman."  Plaintiffs' Response, at 46.  If Dowd made the termination decision and learned of the EEOC charge and lawsuit earlier than Green, which is likely, given Dowd's position at GNC, then Pittman has a serious hurdle to show that the termination claim meets the temporal proximity requirement.

[70]   The Fifth Circuit similarly has relied on a plaintiff's lack of evidence that his supervisor knew of his protected activities until after taking the underlying adverse employment action.  *See Foster*, 160 Fed. Appx. at 389.

*GNC's Nondiscriminatory Reason.*— The Court next considers whether or not GNC has presented a legitimate, nondiscriminatory reason for terminating Pittman's employment. *See Septimus*, 399 F.3d at 610-11.  GNC has done so.  GNC states it fired Pittman in early February 2005, because it believed[71] that he falsified an expense reimbursement request relating to travel on December 30, 2004.  GNC submitted a copy of a written corporate policy explicitly listing "[f]alsifying Company documents" as "grounds for dismissal."[72]  Before it made the termination decision, GNC contends, it knew: (a) that Pittman had requested reimbursement based on a receipt dated December 30 from a Houston restaurant; (b) that Pittman inconsistently announced he was in Region 1 during a company conference call that day; and (c) that Hout, one of Pittman's supervisees, informed management that she believed that Pittman had not visited at least one of the stores he was assigned in Mississippi because, *inter alia*, the store was in terrible condition when she visited and Pittman did not report that fact to her or anyone, as he should have done.[73]  Pittman was also unable to explain the Houston restaurant receipt before he was terminated.[74]

---

[71]   Based on additional evidence, GNC continues to hold that view.  However, the issue is what GNC learned and acted upon at the time it decided to terminate Pittman.

[72]   *See* Misconduct Policy, Defendant's Motion, Exhibit O, at Attachment 1.  The policy is part of the GNC Employee Policy Manual.  *See* Affidavit of Ken Wunschel, GNC Employee Relations Manager, Defendant's Motion, Exhibit O, at ¶ 3.

[73]   Hout stated the store was in extremely poor condition when Pittman would have seen it, had he been where he claimed.  She added: "I would have thought if Mr. Pittman had visited that store, he would have called me and said, okay, Rebecca, what's going on with this store, we're going to get a team in there to clean it up."  Hout Depo., at 33.

[74]   In other state proceedings, Pittman eventually offered two contradictory explanations for the
(continued...)

GNC deemed incredible Pittman's explanation that he flew to Houston from the Memphis or Mississippi area on December 29, collected his wife, and drove many hours back to Region 1 on December 30.[75]  GNC's explanation constitutes a non-retaliatory motive for termination.

> *Proof of Pretext.*—  The burden thus shifts to Pittman to show that GNC's putative non-retaliatory motive is merely a pretext.  *See, e.g., Septimus*, 399 F.3d at 607. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).  "The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' [his] protected conduct." *Septimus*, 399 F.3d at 607 (citing *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004)).  More specifically, the Fifth Circuit has "consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated." *Id.*

---

[74]     (...continued)
receipt.  *See* Defendant's Motion, at 19-20.

[75]     Some of the matters now most troubling to GNC, such as Pittman's alleged fabrication of a motel receipt and perjury before the EEOC, were identified after he left the company. Because the "employer could not have been motivated by knowledge it did not have," the after-acquired evidence is not part of the Court's consideration of GNC's proffered non-retaliatory motive.  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995).

at 608 (citing *Pineda*, 360 F.3d at 487; *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2002) (other citations omitted)).

The Court's job in conducting a pretext analysis, however, is "not to engage in second-guessing of an employer's business decisions," *Lemaire v. State of Louisiana*, — F.3d —, 2007 WL 582702, *7 (5th Cir. Feb. 27, 2007) (citing *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *Mato v. Baldauf*, 267 F.3d 444, 452 (5th Cir. 2001)). The anti-discrimination laws "do not require an employer to make proper decisions, only non-retaliatory ones." *Lemaire*, 2007 WL 582702 at *7 (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (stating that "even an incorrect belief that an employee's performance is inadequate" is a legitimate reason)).

For its explanation of the decision to terminate Pittman's employment, GNC, as noted above, relies primarily on affidavits made on personal knowledge that Pittman's supervisor believed he lied about his whereabouts on December 30 by submitting a false expense report and misrepresenting where he was during a conference call that the supervisor believed took place that day. Pittman bitterly disagrees with GNC's explanation of its motives for the termination decision. Pittman has not produced probative evidence to establish the falsity of GNC's explanation that it relied on the information it possessed to conclude he had lied and that his employment should be terminated. Nor has Pittman shown evidence that, but for the retaliatory intent of Green and GNC, he would not have been fired. The Court addresses Pittman's arguments that Summary Judgement should be denied because there is genuine fact issue on pretext.

Pittman could not recall in his deposition whether the call took place on the 29th or the 30th.  In an affidavit, he now asserts without any evidentiary support that it must have been the 29th.[76]  Even if this change of position by Pittman is deemed a "clarification" of his deposition testimony, and not a contradiction, *see Doe*, 220 F.3d at 385-87; *S.W.S. Erectors*, 72 F.3d at 495, it still is not probative evidence.  The issue is what GNC believed, when it made the termination decision, about Pittman's location on December 30th and whether he lied about it on the conference call.

Pittman's alternative argument suffers the same fate.  He states that he was in fact in Region 1 during the conference call.[77]  Again, accepting this conclusory assertion as

---

[76]    *Compare* Pittman Depo., at 236, *with* Plaintiffs' Response, at 15; *see also* Pittman Aff., at ¶ 6. Notably, Pittman presents no probative evidence that the call did not take place on the 30th, let alone that Green did not genuinely believe that was the case.  Pittman's unsupported arguments about the date of the call are contrary to documentation now available.  GNC has submitted telephone records of its phone lines that indicate strongly the call occurred on the 30th.  *See* Toll Free Solution Dedicated Call Detail, Defendant's Motion, Exhibit O, at Attachment 2.  These records show multiple incoming calls (to GNC) from Pittman's home number, one call lasting 43 minutes on the 30th.  These records, obtained by GNC after its decision to fire Pittman, are received for the limited purpose of corroborating the decision-makers' explanation of their reasoning.  Pittman states the conference call telephone records GNC submitted are "mendaciously fraudulent," but submits no admissible evidence to support his characterization.  Plaintiffs' Response, at 49.  Pittman points to his own telephone records, which contain no outgoing calls corresponding to the GNC records.  However, Pittman's evidence is not probative in light of the testimony offered by GNC from Marilyn Williams, a Southwestern Bell representative, who explains that "toll free calls, which are long distance calls usually placed to 800, 866 and 877 numbers" (which would include the relevant conference bridge) are "billed to the receiving station" and will therefore "not appear on an originating customer's telephone bill."  Affidavit of Marilyn J. Williams, GNC's Reply, Exhibit 2.  Finally, Pittman points to no records showing that he dialed into the office on either December 29th or 30th for a conference call from somewhere other than his home.

[77]    *See* Pittman Aff., at ¶ 6 ("the conference call was on December 29, 2004 while I was still in Memphis").

admissible evidence, it is not proof that GNC believed that he was there.  Pittman produces some documentation, in the form of handwritten and unsigned receipts allegedly from gas stations in his travels,[78] that he was in fact traveling through Region 1 on the 30th, but he presents no evidence that he showed these documents to GNC or that Green or anyone at GNC was aware of them[79] when they concluded he had lied about his whereabouts on that date.  Even if Pittman's unsupported, self-serving and conclusory assertions were probative evidence[80] that he was in Region 1 on December 30th, the evidence is not probative on pretext relating to his retaliatory termination claim.

Pittman finally argues that GNC's procedure for challenging his expense reports was aberrational and thus pretextual.  He points out that Green initially signed off on the disputed report and only returned to it after Chambers's subsequent audit.  Pittman argues that Green's change of position demonstrates that Green was searching for an excuse to fire him.  Green explains that he signed the expense reports hastily because of his hectic schedule, and

---

[78]     *See* Plaintiffs' Response, Exhibit 25, Attachment H.

[79]     Pittman testified at his deposition that he did not submit the receipts to GNC because his travel to Region 1 "was as much a personal trip as it was a business trip," and he "didn't want to give [GNC] any grounds to come after me because I filed an action with the EEOC and subsequent to that a legal action."  Pittman Depo., at 230.

[80]     *See DIRECT TV*, 420 F.3d at 536 (internal citations omitted); *Turner*, 476 F.3d at 343 ("conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are insufficient to defeat summary judgment (citing *Little*, 37 F.3d at 1075)).  "Summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party."  *Turner*, 476 F.3d at 343 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

that Chambers's audit was a standard monthly procedure.[81]  Pittman provides no admissible evidence to controvert this proof.  There is no evidence whatsoever that Chambers knew of the protected conduct on which Pittman relies for his retaliation claim.

Moreover, the logic of Pittman's position escapes the Court.  Green learned of the EEOC charge in July 2004 and learned about the lawsuit sometime in December 2004. Green thus had the same motive to retaliate against Pittman when he first saw the expense report in January 2005.  But Green initially approved Pittman's report rather than rejecting it or immediately investigating its inconsistencies.  Only when Chambers questioned the report during a routine audit did Pittman's veracity become an issue.

Because Pittman has submitted no probative admissible evidence that contradicts GNC's position that, when it terminated his employment, GNC reasonably *believed* Pittman had lied about his whereabouts on December 30, Pittman has failed to raise a genuine fact issue on pretext.[82]  Pittman therefore has not met his summary judgment burden and GNC is entitled to dismissal of Pittman's retaliatory termination claim.

**2.      Pittman's Retaliatory Harassment Claims**

Pittman also asserts that GNC retaliated against him after he expressed his intention to promote Demeke, a Black employee, to a level in the company that had no other Black

---

[81]      Green Second Aff., ¶ 4.

[82]      If Pittman's evidence proves anything, it is merely that GNC may have made an incorrect decision, which is not sufficient to raise a genuine fact issue that GNC's explanation is mere pretext for retaliation.  *See Lemaire*, — F.3d at —, 2007 WL 582702 at *7.

employees.[83]  Pittman claims this was protected activity in opposition to GNC's alleged discriminatory policy.  Pittman claims that in response, he suffered "harassing phone calls; malicious and baseless write-ups and queries by Green; threats of termination by Dowd; public humiliation during weekly conference call[s] . . . ; vindictive visits by Director of [R]etail Stores Jim Burns; [and] creati[on of] a hostile work environment."[84]

### a.    "Protected Activity"

It is undisputed that Pittman participated in protected activity by filing an EEOC charge and commencing this lawsuit.[85]  GNC contends that Pittman's protected activity was limited to these filings.[86]  The Court disagrees.  Pittman's alleged insistence to Dowd that Demeke be promoted also was protected activity[87] when the evidence is construed in the light most favorable to Pittman. In discussing Demeke's proposed promotion after allegedly being

---

[83]     *See* Amended Complaint, at 8, ¶ 25 ("This retaliation and harassment was and is due to Pittman exercising his rights by opposing discriminatory practices and for participating in EEOC investigation, and for filing this suit."); *see also id.* at 6, ¶ 12(j) ("For advocating the promotion of Demeke, filing a charge with EEOC, and instituting this action, Defendant proceeded to harass and retaliate against Pittman, and on February 3, 2005, summarily terminated his employment with GNC.").

[84]     Amended Complaint, at 8, ¶ 25.  It is noted that Pittman does not allege in the Amended Complaint any claim of retaliatory denial of promotion and no such claim can now be pursued in this case.  The Amended Complaint simply alleges retaliation in that he received "harassing phone calls; malicious and baseless write-ups and queries by Green; threats of termination by Dowd; public humiliation during weekly conference call[s] that included all of Pittman's peers; vindictive visits by Director of retail stores Jim Burns; creat[ion of] a hostile work environment; and summary termination."  Amended Complaint, ¶ 25.

[85]     *See, e.g., Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 394 (5th Cir. 2000).

[86]     *See* Defendant's Motion, at 36.

[87]     *See* Amended Complaint, at 8; Pittman Depo. at 149-50.

made aware that GNC discriminated against Demeke, Pittman "opposed [a] practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). "To satisfy this opposition requirement, [a plaintiff] need only show that she had a 'reasonable belief that the employer was engaged in unlawful employment practices.'"[88] *Turner*, 476 F.3d at 348 (quoting *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000)). Speech in support of the rights of minorities is protected activity. *See Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003), *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1229 n.15 (5th Cir. 1982).

Crediting Pittman's version of events as the nonmovant, he first became aware of GNC's discriminatory animus against Demeke as a Black employee when Dowd informed Pittman that "we don't promote those guys."[89] According to Pittman, he then expressed his disagreement with Dowd's warning, praised Demeke's accomplishments[90] and indicated his own prior commitment to promote Demeke if he were ever put in a position to do so.[91]

---

[88]   There is no evidence, however, that Pittman believed that GNC was discriminating against Demeke before his conversation with Dowd. Pittman's representation to Scott that he would promote Demeke, made earlier that same day, Pittman Depo., at 143, was therefore not protected activity. *See Turner*, 476 F.3d at 348.

[89]   Pittman Depo., at 149.

[90]   *Id.* at 150 ("I said, 'Tom, I can't believe what I'm hearing.' I said, 'We've both known Al forever.' I said, 'He's always done a superb job. He's well respected. He's won every award that you could possibly be up for. He's won it and won it in consecutive years. I mean, it's almost boring going to national meeti[n]gs. You knew Al Demeke was going to be up there and get the award.' And I said, 'I can't believe what I'm hearing.'").

[91]   *Id.* at 150 ("And I said, 'Tom, I can't do that. I can't do that to Al.' I said, 'You know, I've already talked to the guy, that he's—he's the most prepared as I've ever seen anybody step
(continued...)

Moreover, Pittman testified at his deposition that when "Dowd asked me to change my position on promoting Mr. Demeke to the position of regional sales director, that I should reconsider that, . . . I refused to reconsider it."[92]  As the nonmovant on this issue, Pittman is entitled to construction of this evidence in his favor.  *See Reaves*, 336 F.3d at 412.  Accordingly, the Court interprets his statements to Dowd as protected speech advocating Demeke's rights as a minority.  For the purposes of his harassment claims, Pittman's protected activity therefore dates back to September 25, 2003, when Pittman allegedly learned of and objected to a GNC discriminatory corporate policy.

###### b.     Material Adverse Employment Action

"The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006); *see also Grice v. FMC Technologies, Inc.*, 2007 WL 329265 *5 (5th Cir. Jan. 30, 2007); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 2007 WL 126081 *3 (5th Cir. 2007) (held on facts presented, written warning to employee would not and did not dissuade the employee (as a "reasonable worker") from making or supporting a charge of discrimination; court looked to see if there were "colorable grounds for the

---

[91]      (...continued)
in that position.  And I can't believe it hasn't happened before now.  And I gave the guy my word that if I was ever in the position, I was going to do something for him.'").

[92]      *Id*. at 123.

warning").[93]   The anti-retaliation provision, unlike the substantive anti-discrimination provision of Title VII, is not limited to discriminatory actions that affect the terms and conditions of employment.  *See Burlington*, 126 S.Ct. at 2412-2413.

The Supreme Court in *Burlington* explained that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  126 S.Ct. at 2415 (citations and internal quotations omitted).  The term "material adversity" is used to emphasize that "it is important to separate significant from trivial harms.  Title VII . . . does not set forth a general civility code for the American workplace."  *Id.* (citations and internal quotations omitted).   "[S]lights or minor annoyances that often take place at work and that all employees experience, . . . personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable" under Title VII.  *Id.* at 2415.   "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms," *Id.* (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997)), that is, "by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers."  *Id.*

---

[93]   The Court cites unreported Fifth Circuit cases because, as yet, the Circuit has not issued a reported decision interpreting *Burlington Northern*'s retaliation standard.  *But see Lemaire*, 2007 WL 582702, at *6 (holding, without analysis, that "a two-day suspension without pay might have dissuaded a reasonable employee from making a charge of discrimination").  The Court relies on the unreported decisions for their reasoning and not as binding authority.

The Court must gauge the issue of the seriousness of the adverse action through the lens of "the reactions of a *reasonable* employee," thereby using an objective standard. *Burlington*, 126 S.Ct. at 2415. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 2407. Finally, "this standard does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge." *Id.* at 2416 (emphasis original; addressing a criticism of the concurrence). The Court must consider "the [materiality of the] challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint," and thus "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 2416.

Pittman's claims and supporting evidence on GNC's alleged retaliatory harassment do not refer to specific dates. It appears, however, that Pittman contends that he was a victim of alleged GNC retaliatory harassment during periods both prior to and after he filed his EEOC charge on March 18, 2004.[94]

Applying a "reasonable employee" or objective standard to Pittman's harassment complaints, the Court concludes that most of Pittman's examples of retaliatory harassment, even if they are deemed specific enough to constitute admissible summary judgment

---

[94]   *See* Pittman Depo., at 124-125 (allegedly harassing early-morning telephone calls took place in late 2003, before the EEOC charge); Dowd Depo., at 204 (GNC's allegedly harassing investigation into Pittman's excuse for missing a corporate function took place after this lawsuit was filed).

evidence (which by and large they are not) are not actionable.  Most amount to "slights or minor annoyances that often take place at work and that all employees experience," "personality conflicts at work that generate antipathy," or "'snubbing' by supervisors and co-workers," none of which are actionable under Title VII.  *Id.* at 2415.  Pittman alleges that Green, for about a month at the beginning of the latter's employment, repeatedly called early in the morning with questions about the prior day's sales.[95]  This conduct may be annoying but would not cause a reasonable employee to refrain from engaging in protected conduct.[96] The allegation that Green created a "generally hostile environment" similarly is not actionable.[97]  Nor is the vague assertion that Dowd made "threats of termination" or that some unnamed person at GNC publicly humiliated him during weekly conference calls.[98] Finally, that Director of Retail Stores Jim Burns allegedly made "vindictive visits" is not

---

[95]     *See* Pittman Depo., at 124-25.

[96]     Pittman offers no details or particularized evidence about the allegedly harassing telephone calls.  In his deposition he asserted that "I did keep a calendar for a while documenting all the times that I received phone calls from Darryl Green at 6:00 in the morning asking me if I was up, and that was probably every day for a good month or so.  He would call just to see if I was up and then see if I knew what my numbers were from the previous day."  Pittman Depo., at 124.  Inexplicably, Pittman was unsure whether he still had the calendar and has not offered it in evidence.

[97]     In this regard, Pittman asserts that when he missed a corporate function because his wife was undergoing a medical procedure, GNC harassed him by attempting to verify with the hospital that the excuse was genuine.  *See* Plaintiffs' Response, at 30.  Pittman admits however that he was never disciplined for failing to attend the function, Pittman Depo., at 131, and has not explained how GNC's investigation harassed him.

[98]     *See, e.g.*, Pittman Depo., at 272-273.

sufficiently precise to be admissible evidence and does not assist Pittman to satisfy the *Burlington* objective test for "material adversity."

The Court concludes, on the other hand, that there is a fact issue about whether Pittman's negative performance evaluations and/or "write-ups" were materially adverse employment actions under *Burlington*.  Pittman claims he suffered "malicious and baseless write-ups and queries by Green,"[99] which appear to relate to Pittman's further allegation that "[b]etween December 8, 2003 and November 5, 2004, Green documented and filed over eight spurious performance related issues" against him.[100]  Pittman explained that his performance scores dropped precipitously and without justification once Green took over the evaluations.[101]

GNC contends that there is no causal link (the third *prima facie* element) on many, if not most, of the performance evaluations and write-ups because they occurred before Green became aware of Pittman's EEOC charge or advocacy of Demeke and thus these acts by Green are not probative.[102]  Pittman does not present any evidence establishing when Green learned of Pittman's intention to promote Demeke or Pittman's alleged support of

---

[99]     Amended Complaint, at 8, ¶ 25.

[100]    Plaintiffs' Response, at 31.  The documents Plaintiffs refer to are nine memoranda from Green to Pittman, expressing Green's displeasure with specific aspects of Pittman's performance. *See* Internal Correspondence from Darryl Green to Tony Pittman, Plaintiffs' Response, Exhibit 25, at Attachment S.

[101]    *See* Pittman Depo., at 201 ("the total point score 262.5, compare that to all my reviews prior to that, there's like a 40 or 50-point swing that can't be explained").

[102]    *See* Defendant's Motion, at 36.

Demeke's rights.  Pittman's response to GNC's contention that Green was unaware of any such protected activity is that *Dowd* was cognizant of it and that it was Dowd who was actually directing the harassment implemented through Green.[103]  When the apparent decisionmaker "serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact."  *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).  The ultimate question, therefore, is whether "'the employee can demonstrate that [with improper motive] others had influence or leverage over the official decisionmaker.'"  *Id.* (quoting *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001)).  GNC contends that Dowd's only directive to Green regarding Pittman's performance reports was that "if [Green] had any performance issues, to document it, and make sure that [Green] sent the letter to [Dowd] to explain what the issues are," and that this was standard procedure with any employee who was not meeting expectations.[104]  This evidence raises fact issues about whether Dowd had some involvement (albeit indirect) in supervising Pittman, and the degree to which the apparent decisionmaker (here, Green) was influenced by another actor (Dowd).  *See Gee*, 289 F.3d at 346; *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996).  Because the Court must construe the evidence in Pittman's favor, and because the record is sparse on Dowd's role in these matters, the Court concludes that GNC has not demonstrated the absence of a genuine fact issue on this aspect of Pittman's retaliation claim.  There also remain issues about what the

---

[103]     *See* Plaintiffs' Response, at 53-54.

[104]     Green Depo., at 187; Defendant's Reply, at 10-11.

effect of Pittman's declining performance evaluations or write-ups on his pay or otherwise, the degree of control Dowd exercised over Green's evaluations of Pittman's performance as opposed to subordinates in general, and when and why Dowd made the comment to Green about documenting Pittman's performance issues. Construing the record in Pittman's favor, the Court denies summary judgment on Pittman's claim that he suffered retaliatory negative performance evaluations and unfounded write-ups.

### 3.   Pittman's Discrimination Claims

#### a.   Pittman's "Associational Discrimination" Claim

Pittman alleges under both Title VII and § 1981 that GNC "discriminated" against him by (i) withdrawing his promotion to DVP and terminating him because he advocated Demeke's promotion to DSD, and (ii) "because of his [Pittman's] race (White)."[105]  Turning to the latter contention, none of Pittman's evidence, even viewed in the light most favorable to his claims, suggests under a direct evidence theory that GNC's allegedly all-White management intentionally discriminated against him *because* he is White, and not a person "of color." Further, he cannot establish his *prima facie* case under the burden-shifting rubric. Because no evidence before the Court supports this discrimination theory, it is rejected to the extent that Pittman impliedly asserts it.

Regarding the other "associational discrimination" theory, Pittman alleges that he suffered discrimination "as a result of his association and advocacy in promoting Demeke

---

[105]      Amended Complaint, at 6, ¶¶ 14, 15; *id.* at 7, ¶ 23.

to replace him as [DSD] and in retaliation for his opposition to GNC's discriminatory policy and for participating in EEOC proceedings."[106]  GNC discriminated against him, Pittman asserts, "because of his expressed intention to promote Demeke and in so doing, [GNC] effectively prevented Demeke's promotion to [DSD]."[107]  This claim is vague and in large part redundant of other claims Pittman asserts.  GNC's allegedly unlawful basis for the promotion and termination decisions in issue, as set forth by Pittman in the Amended Complaint, thus is subject to three possible closely related constructions: (a) that Pittman's advocacy for Demeke's promotion was the men's "association," (b) that the protected "association" was a relationship between Pittman and Demeke, or (c) that advocating for Demeke's rights was protected as free speech, regardless of the "association" element.  The Court addresses each in turn.

To the extent that Pittman asserts that GNC discriminated against him because his advocacy for Demeke in September 2003 was protected association, that claim is functionally indistinguishable in large part from Pittman's retaliation claims.  These retaliation and discrimination theories both are limited by the deficiencies in Pittman's proof addressed above in sections III.1 and III.2.  All of the Court's findings and rulings related to the retaliation claims are therefore applicable to this associational discrimination theory.[108]

---

[106]     *Id*. at 6, ¶ 15.

[107]     *Id.* at 6, ¶ 14.

[108]     It does not appear that GNC sought summary judgment on the associational discrimination theory regarding Pittman's promotion rescission claim.  Thus, subject to clarification by the
(continued...)

Insofar as Pittman intends to argue that the protected "association" was some social relationship with Demeke, the second alternative identified above, the Court concludes that the claim is legally insufficient.  In the Fifth Circuit, Title VII and § 1981 prohibit employers from discriminating against an employee on the basis of certain interpersonal relationships related to the employee's race.  *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998), *rev'd in part*, 169 F.3d 215 (5th Cir. 1999), *reinstated in relevant part on reh'g en banc, Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) ("In sum, Title VII prohibits discrimination in employment premised on an interracial relationship." (collecting authorities)).  GNC argues that only marital or other intimate relationships are protected,[109] but the point is academic.  Pittman has not proven or even asserted that he and Demeke had any sort of "relationship."[110]  Pittman certainly was acquainted with and had supervised Demeke, which was the basis of his allegedly high opinion of Demeke's job performance.[111]  But, there is no indication that the two had a personal, social or intimate friendship, or that they even had worked closely together.  Assuming *arguendo* that non-intimate relationships enjoy statutory or constitutional

---

[108]     (...continued)
parties in the Joint Pretrial Order, it appears that Pittman's claim that GNC rescinded his promotion in September/October 2003 because of his association through advocacy of Demeke's rights may continue.

[109]     *See* Defendant's Motion, at 38.

[110]     "Relationship" is defined as "1. the state or fact of being related; 2. kinship; 3. a sexual involvement; affair."  RANDOM HOUSE WEBSTER'S DICTIONARY 559 (1993).

[111]     *See* Pittman Depo., at 150.

protection, which is a serious question, Pittman has not established that he and Demeke had *any* relationship that would constitute protected "association." Pittman has failed to establish a critical element of this form of his associational discrimination claim, and summary judgment is appropriate on this theory as well.[112]

Finally, Pittman may be trying to argue under either Title VII or § 1981 that he was protected from action by GNC motivated by the company's hostility to his pure advocacy – in and of itself – of Demeke's rights (rather than the men's association). Such a potential Title VII action, as discussed above, is functionally identical to the first version of his "associational discrimination" claim described above, and accordingly is limited by the Court's rulings on Pittman's retaliation claims. Further, in this case, a § 1981 employment discrimination claim based on Pittman's advocacy *per se* is coterminous with the Title VII theory and thus suffers the same fate.[113]

Therefore, Pittman's associational discrimination claims will be dismissed to the extent they overlap with his retaliation claims that are defeated by GNC's summary judgment motion.

---

[112]   Demeke's assertion of this claim fails on this ground as well.

[113]   Another conceivable § 1981 advocacy theory might have been that GNC violated Pittman's First Amendment right to express his views. Pittman has not, however, even hinted that he intends to assert a First Amendment claim under § 1981 or otherwise. It is far too late for Pittman to amend his claims at this juncture.

**b.      Sufficiency of the Evidence on Discrimination Claims**

GNC argues that the Court should grant it summary judgment on Pittman's discrimination claims because he has presented no credible evidence that he ever advocated for Demeke on September 25, 2003, or that Dowd ever discussed with Pittman at that time the possible promotion of Demeke.  Specifically, GNC contends that Pittman's version of the events surrounding his interview for the DVP position is "fanciful, incredible, implausible, and contradictory testimony."[114]  Pittman's credibility is certainly in serious question and it does not escape the Court's notice that his explanation of the events surrounding his alleged promotion has expanded significantly prior to and during this lawsuit.  GNC's request nevertheless is denied.  GNC cites no binding authority to justify the result it seeks.  Significantly, GNC also has not identified how Pittman's affidavit "impeaches, without explanation, sworn testimony." *S.W.S Erectors*, 72 F.3d at 495 ("When an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment.").  *Id*. at 496.  The Court is mindful of the mercurial nature of Pittman's testimony, but credibility concerning the events of September 25, 2003, and everything else is a matter for the ultimate finder of fact at trial.

---

[114]    Defendant's Motion, at 39.  GNC cites several non-binding cases for the proposition that genuinely incredible testimony is not competent summary judgment evidence.  *See, e.g., Christian Dior-New York, Inc. v. Koret, Inc*., 792 F.2d 34, 38 (2d Cir. 1986); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476-77 (S.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460, 470-71 (S.D.N.Y. 1998); *Schneider v. OG&C Corp*., 684 F. Supp. 1269 (S.D.N.Y. 1988).

IV.   **CONCLUSION**

As explained in detail in this Memorandum and Order, (i) Defendant GNC is entitled to summary judgment on Plaintiff Demeke's disparate impact theory of discrimination; (ii) GNC is entitled to summary judgment on Plaintiff Pittman's claim of retaliatory termination; (iii) GNC is entitled to summary judgment on all of Pittman's retaliatory harassment claims except his theory that Dowd directed Green to issue adverse performance evaluations and writeups; (iv) GNC is entitled to summary judgment to the extent Pittman's discrimination claim alleges he had a protected relationship with Demeke, and (v) GNC is entitled to summary judgment on the aspects of Pittman's associational discrimination claims to the extent the Court's rulings on Pittman's retaliation claims govern and limit the scope of his discrimination claims.  It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 103] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Plaintiffs' Motion for Summary Judgment on the Claim of Disparate Impact [Doc. # 105] is **DENIED.**  It is further

**ORDERED** that the parties **shall participate in good faith in mediation** of their claims on or before **April 19, 2007**.  All other deadlines remain in effect.

**SIGNED** at Houston, Texas, this **28**th day of **March, 2007**.

Nancy F. Atlas
United States District Judge