IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TONY PITTMAN, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>GENERAL NUTRITION CORP.,<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-04-3174 |

**MEMORANDUM AND ORDER**

This is an employment discrimination case, filed by Tony Pittman and Al Demeke against General Nutrition Corp. ("GNC") under Title VII of the Civil Rights Act of 1964. Pending before the Court is GNC's Motion to Strike Expert Witness Richard L. Adams (the "Motion") [Doc. # 104]. Plaintiffs have responded [Doc. # 112], and Defendant replied [Doc. # 116]. Having considered the parties' submissions, all matters of record, and applicable legal authorities, the Court concludes that Defendant's Motion should be **granted in substantial part.**

**I.    BACKGROUND**

GNC is a retailer of nutritional supplements such as sports nutrition products, diet products, vitamins, minerals, and specialty supplements. Plaintiff Al Demeke is and has been an employee of GNC for many years. Plaintiff Tony Pittman was a GNC employee for many years until early February 2005, when GNC terminated his employment.

GNC operates its many retail stores through a hierarchy of managers and executives, with several layers of supervisors in and above the store level.[1] Every DSD is assigned to one of three geographic Divisions, each of which is headed by a DVP. DVPs are responsible only to GNC's corporate headquarters. The details of the parties' summary judgment positions and the evidence of record are set forth in some detail in a Memorandum and Order issued March 28, 2007 [Doc. # 123], and will not be repeated here.

At times relevant to Plaintiffs' claims, Pittman was a DSD and Demeke worked under him as an RSD. Pittman states that on or about September 25, 2003, while he was at company headquarters in Pittsburgh, he was told by upper management that he had been promoted to DVP of his division. He testifies that he immediately orally accepted the promotion and that, when he informed GNC executives that day that he intended to promote Demeke, a Black RSD, to fill the DSD slot he would vacate, the company rescinded his promotion. According to Pittman, he immediately protested the resistance by GNC to permit him to promote Demeke to the DSD level. GNC gave the position to an outside candidate, Darryl Green, whom Plaintiffs claim began to harass Pittman.

Pittman filed an EEOC charge in March 2004, alleging that GNC's rescission of his promotion was due to associational discrimination because of his intention to promote Demeke. He later claimed he suffered harassment and job termination in early February

---

[1]   In the stores are Store Managers, Senior Store Managers and District Managers. Above the store management, in order of rank, are Regional Sales Directors ("RSDs"), Divisional Sales Directors ("DSDs"), and Divisional Vice Presidents ("DVPs").

2005,[2] in retaliation for his protesting GNC's discriminatory promotion policy, for filing the March 2003 EEOC charge, and for instituting this lawsuit in 2004. GNC disputes Pittman's version of events, arguing that he was never offered the DVP promotion, that he was never harassed, and that he was terminated for gross misconduct, namely, falsifying his expense reimbursement form and lying to his supervisor about his whereabouts at the end of December 2004.

Demeke was promoted to RSD in 1986. He has never been promoted to DSD. Twenty GNC employees have been promoted to the position of DSD between 1998 and 2005, several of them simultaneously when, in 2002, all of the Division II DSDs were terminated for unrelated reasons.

Pittman and Demeke jointly filed this suit and, as amended, their claims assert that GNC variously harassed, discriminated and retaliated against them in violation of both Title VII and 42 U.S.C. § 1981.

In support of their claims, Plaintiffs offer the expert testimony of Richard L. Adams, a human resources professional. Adams in his initial report [Doc. # 70] ("Adams Report") offers various opinions:[3]

---

[2] The date of Pittman's discharge is unclear; Plaintiffs say it occurred February 3 (Amended Complaint [Doc. # 33], at 6, ¶ 12(j)) and on February 5 (Plaintiffs' Response to Defendant's Motion for Summary Judgment [Doc. # 112], at 19). Defendant also uses February 5 (Defendant's Motion for Summary Judgment [Doc. # 103], at 2), but in the same pleading says it occurred February 2 (*id.*, at 3). The exact date is immaterial at this stage.

[3] The Court only summarizes opinions that continue to be relevant after dismissal of certain of Plaintiffs' claims upon GNC's summary judgment motion. For instance, the Court does not
(continued...)

(1)   that Demeke is a "very qualified management employee and one capable of further promotion," who appears more qualified than some of the others who have been hired or promoted to DSD, and that GNC's contention that Demeke was "not qualified or "less qualified" than those who were promoted or hired to that position is "no more than a pretext to avoid having to promote Demeke" or any black person above RSD;

(2)   that GNC failed to "seriously consider" Demeke for promotion to DSD or even interview him for the job, despite numerous openings over many years, resulting in "personal disparate treatment" of Demeke;

(3)   that GNC's decision not to promote Pittman because he was not qualified or was less qualified than Green was "nothing more than a poorly fabricated pretext to avoid having to promote" Pittman;

(4)   that Pittman is "a credible witness";

(5)   that GNC did not follow human resources standards in various ways, such as rehiring a person whom the company had marked previously "not eligible for rehire," criticizing Pittman in public, and ultimately terminating Pittman's employment without adequate investigation, and that these facts are evidence that GNC retaliated against each Pittman and Demeke for participating in an activity to enforce employment discrimination laws; and

---

3   (...continued)
address Adams's opinions relating to Demeke's disparate impact claim.

(6) that both Pittman and Demeke suffered substantial quantifiable financial losses, in loss of income, benefits and other respects, culminating in the opinion that Demeke suffered economic damages of roughly $1.8 million[4] and Pittman suffered $3.6 million.

Defendant GNC submitted the report of its own expert, Haran Levy, who concluded that Adams's work "is speculative, erroneous and overstates potential economic losses for both Mr. Demeke and Mr. Pittman." Expert Report of Haran Levy ("Levy Report"), at 7. In response, Adams prepared a supplemental report in which he acknowledged several errors, such as his failure to apply a present-value discount to his economic damages calculations. *See* Supplementary Report of Richard Adams ("Adams Supplement"), at 5. Defendant now moves to strike Adams as an expert witness, asserting that his poor methodology renders his conclusions speculative, conjectural and inadmissible at trial.

## II.  **LEGAL STANDARDS FOR EXPERT WITNESSES**

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise." FED. R. EVID. 702.[5] The

---

[4]  Adams offered a reduced, alternate figure for Demeke on the assumption that a four-year statute of limitations would reduce his recoverable losses.

[5]  Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of
> (continued...)

trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156-57 (1999). In other words, the Court must assess also "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (quoting *Kumho*, 526 U.S. at 156); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). The judge must pre-screen the expert witness's proffered opinions to ensure that they comply with other requirements of Rule 702 of the Federal Rules of Evidence. Expert testimony is admissible only (1) if it qualifies as scientific, technical or other specialized knowledge and (2) if it will assist the trier of fact to understand the evidence or resolve a disputed factual issue. *Kumho Tire Co.*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). In other words, the testimony must be reliable and relevant. *Pipitone*, 288 F.3d at 244-45; *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580-81 (5th Cir. 2001); *Tanner*, 174 F.3d at 547.

The proponent of the expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Rodriguez*, 242 F.3d at 581 (citing *Tanner*, 174 F.3d

---

5   (...continued)
    reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

at 547). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under FED. R. EVID. 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000), *cert. denied*, 531 U.S. 812 (2000) (upholding district court's exclusion of plaintiff's statistical expert in disparate impact case).

### III.   ANALYSIS

#### A.   Adams's Qualifications

Fundamentally, Adams is a human resources and personnel professional. He has a Bachelors of Arts in Business Administration from Whittier College and a Masters of Science in Human Resources from California State University, Long Beach. He represents that he has experience representing clients and testifying in wrongful termination and discrimination suits. He worked as a Personnel Specialist and Director of Personnel for private corporations for nearly a decade before becoming president of his own consulting company in 1977. Adams's company specializes in advising clients on "reasonable compliance" with statutory and administrative standards in the field of human resources. Adams is qualified by experience and education to offer opinions regarding prevailing standards in the personnel field and on GNC's adherence to such standards, as well as its own policies as such policies would typically be interpreted in the workplace.

### B.     Adams's Opinions Regarding Intentional Discrimination and Retaliation

Defendant GNC argues that Adams's testimony regarding GNC's alleged intentional discrimination and retaliation is inadmissible because his opinions are based on "[g]eneralized societal information [that] does not qualify as specialized knowledge that an expert may explain to a jury."[6] In essence, GNC contends that Adams's opinions on intentional discrimination are unreliable because they are founded solely on Plaintiffs' versions of the events, and constitute a surrogate for attorney argument. GNC specifically identifies Adams's conclusion that "GNC did not follow Human Resources standard [*sic*] of performance when they retaliated against Pittman," because this conclusion is based entirely on Plaintiffs' version of events, and does not account for GNC's explanations.[7]

Given Adams's human resources expertise, a few of his conclusions are admissible, but many are not. The latter are matters within the jury's experience and are not matters on which the jury needs "expert" testimony. *See Tanner v. Westbrook*, 174 F.3d at 548 (the court must assess also "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case."); *In re Aircrash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986). Examples of opinions that are not admissible are Adams's conclusion that "the Company was looking for an excuse to not promote Mr. Pittman"; that GNC therefore "intended" to "discriminate" against Plaintiffs;

---

[6]     Motion, at 5.

[7]     Motion, at 7 (quoting Adams Report, at 3). Defendant does not otherwise identify which of Adams's statements should be struck on this basis.

that GNC's explanation for not promoting Demeke "was no more than a pretext to avoid having to promote Demeke" or any Black person above RSD; that the "failure of GNC to promote Mr. Demeke . . . provides proof that GNC made discriminatory employment decisions toward Mr. Demeke"; and that GNC's decision not to promote Pittman because he was not qualified or was less qualified than the person who filled the position (Green), was "nothing more than a poorly fabricated pretext to avoid having to promote" Pittman. These opinions invade the province of the jury, which is capable of deciding on its own GNC's motivations and the existence of "pretext" after considering the evidence at trial. *See United States v. Willey*, 57 F.3d 1374, 1389 (5th Cir. 1995) (citing *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir.1986) ("Trouble is encountered only when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense.").

Furthermore, certain of Adams's opinions are inadmissible as legal conclusions. Examples here are his statements that GNC "intentionally discriminated" against Plaintiffs and that GNC's explanation and conduct was "nothing more than a poorly fabricated pretext to avoid having to promote" Pittman.[8] *See, e.g., Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) ("discrimination" is a term of art under Title VII, making expert witness's testimony that defendant discriminated against plaintiff an impermissible legal conclusion (citation omitted)); *Torres v. County of Oakland*, 758 F.2d

---

8      Adams Report, at 3.

147, 150-51 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury."); *Brazos River*, 469 F.3d at 435 ("Opinions phrased in terms of inadequately explored legal criteria would be inadmissible.").

On the other hand, there are certain opinions that are admissible in that they appear to be grounded in personnel expertise and would assist the jury's determination. An illustration is Adams's conclusion that GNC's decision to fill the DVP position allegedly offered to Pittman with another candidate whom GNC had fired some time before for poor work performance is a violation of GNC's own policy against rehiring applicants who were previously fired "for cause."[9]  This opinion, although subject to debate in light of countervailing evidence,[10] is admissible as a matter within Adams's expertise, is outside many jurors' experience, and puts GNC's decision in context. GNC may cross-examine Adams as to deficiencies in his factual or other foundations of, or the reasoning for, his opinions.

Another admissible opinion Adams offers is the assessment that Demeke appears to be a "very qualified management employee and one capable of further promotion," and

---

[9]   Adams explains that it "is a Human Resources standard of performance for a company to have established a policy of this nature," and that it "is only in an extreme and severe situation that a Company would violate a policy of this nature." Adams Report, at 5.

[10]  GNC argues that Adams unintentionally misconstrues the facts, making the opinion unreliable. According to GNC, it complied at all times with its policy allowing it to rehire an employee terminated for cause so long as the decision is vetted by the Vice President of Human Resources. *See* Motion, at 12, and materials cited therein. The Court addresses the factual accuracy of Adams's conclusions below.

appears to be more qualified than some of the others who were hired or promoted to DSD. The jury may give these opinions as much or as little weight as they deem appropriate in light of the available evidence. *See Caboni v. General Motors Corp.*, 398 F.3d 357, 361 (5th Cir. 2005) ("The trier of fact . . . is not bound by expert testimony and is entitled to weigh the credibility of all witnesses, expert or lay.").

The Court has considered GNC's assertion that, because the facts on which Adams relied are inaccurate, his conclusions are inadmissible as "unreliable," citing *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (Expert testimony "which was not based upon the facts in the record but on altered facts and speculation" was properly excluded)). The Court rejects GNC's objections that Adams's opinions of a factual nature are unreliable simply because he relied solely on Plaintiffs' unsworn renditions of the facts. Adams is entitled to rely on Plaintiffs' versions of the events. In any event, he states he also relied on documents that GNC provided to Plaintiffs pursuant to discovery request.[11] GNC may demonstrate through cross-examination that Adams (as he acknowledged in his supplemental report) reached his original conclusions without reviewing various depositions and documents, which may have affected his ultimate conclusions.[12] GNC also may point out where appropriate that Adams relies on factual assertions that the jury should reject in

---

[11]   Response, at 8 n.6; Adams Report, at cover sheet (he reviewed "about 2700 pages of documents," including those produced by GNC).

[12]   *See, e.g.*, Adams Supplement, at 4 ("<u>Mr. Pittman's deposition was not available to me when I performed my initial opinions</u> and therefore I was not aware of the fact that this new employer . . . provided 401(k) benefits.") (underlining original).

light of other evidence at trial. In sum, GNC's objection about the lack of factual foundation for Adams's opinions – where related to the application of personnel standards – relates to the weight to which his testimony is entitled, an assessment the jury can perform at trial.

It is noted, however, that where Adams offers an opinion of a factual nature but the opinion is predicated on clear and unambiguous misunderstanding of the *uncontested* record, the opinion will not be received in evidence; such an opinion is irrelevant, lacks probative value, would confuse the jury, and would be a waste of time. *See* FED. R. EVID. 401, 402, 403. Where, however, Adams's opinions on personnel standards or GNC's adherence to its own policies are based on his or Plaintiffs' interpretation of disputed facts, the opinions are admissible. Whether or not to accept Plaintiffs' version of events, and thus to credit Adams's resulting opinion, is a matter for the jury to decide.

GNC also moves to strike Adams's opinion that Pittman is credible.[13] This motion will be granted. Expert witnesses may not pass judgment on the credibility of other witnesses. *See United States v. Moore*, 997 F.2d 55, 58-59 (5th Cir. 1993) (holding in criminal law context that expert witnesses may not offer testimony that he believes another witness) (citing *United States v. Price*, 722 F.2d 88 (5th Cir. 1983)); *see also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("[E]xpert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony."). Adams's opinion of Pittman's credibility is excluded. A jury is perfectly capable of making such judgments.

---

[13] "It is my expert Human Resources opinion that Mr. Pittman is a credible witness and that [Pittman's version of] facts and events actually occurred." Adams Report, at 5.

In sum, Adams may testify that certain GNC conduct was inconsistent with what he deems prevailing human resources standards or GNC's own personnel policies, but may not testify that certain facts show an intent to discriminate or retaliate, show "discrimination," or show "pretext."  Before any such testimony or opinions will be received at trial, however, the Court must ensure that Adams complies with this ruling.  Adams must provide GNC by **April 9, 2007,** a final report, organized into numbered paragraphs, with a separate number for each policy or standard he claims GNC violated.  As to each such policy or standard, Adams shall supply in subparagraphs: (i) a summary of the bases for the conclusion and (ii) a citation to his earlier report(s) where he previously disclosed the policy or standard violated.  No policy or procedure may be included in the list that was not previously identified in Adams's earlier reports.  Thereafter, if necessary, the Court will hold an evidentiary hearing outside the presence of the jury, *see* FED. R. EVID. 104, on Adams's qualifications and the admissibility of any challenged opinions in the final report.[14]

### C.    Adams's Opinions on Plaintiffs' Economic Damages

GNC seeks to strike in their entirety Adams's opinions regarding Plaintiffs' alleged economic damages on the grounds that Adams lacks experience in damages calculations and his methodology is materially flawed in many respects.  Adams opines on past and future economic damages for each Plaintiff in the following categories: differential in base salary, differential in yearly bonuses, lost benefits including investment consultation services,

---

[14]    GNC is not permitted to re-argue the points the Court has ruled upon in this Memorandum.

medical reimbursement benefits, 401(k) losses (employee and employer contributions), and loss of opportunity to purchase stock options.

The Court agrees with GNC that much of Adams's damages analysis is outside his disclosed realm of expertise. There may be, however, several limited opinions that are within his expertise and thus on which he is qualified to opine. The record is insufficient for the Court to definitively rule in this regard.

Experts may be qualified by virtue of their "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Adams's education and experience is as a human resources consultant for small businesses and as a litigation witness. Adams does not profess expertise in damages calculations. His numerous errors in calculations and analysis demonstrate that many of his opinions are not reliable because they were not derived in accordance with accepted methodology. Indeed, Adams acknowledges that he has no experience in valuing future stock options,[15] valuing lost benefits, or as an economist in applying present value discounts to future earnings calculations.[16] The Court concludes that Adams is not qualified to opine on these components of Plaintiffs' damages.[17] Moreover, his opinions on these

---

[15] Adams Report, at 9.

[16] Adams Supplement, at 4 (As to 401(k) plan values: "I'm not an accountant, but I am not aware those documents prove Mr. Levy's point."); *Id.* at 5 ("With regard to 'discounting future losses' I am not an economist, but in fact a Human Resources expert.").

[17] Adams not only failed to properly discount Pittman's alleged lost wages for the time-value of money, he was apparently not aware that he was required to do so. *See Rhodes v. Guiberson Oil Tools*, 82 F.3d 615, 622 (5th Cir. 1996) ("Lump sum awards for future damages should be discounted to present value in all cases in which it is reasonable to assume

(continued...)

subjects are essentially guesses based on insufficient information and lack a reliable foundation.[18]

It is further noted that many of Plaintiffs' claims have been dismissed as not legally viable. See Memorandum and Order [Doc. # 123] dated March 28, 2007. This result affects the damages Plaintiffs may seek and renders much of Adams's reports and many of his opinions irrelevant.

Nevertheless, Adams may be qualified to render opinions about each Plaintiff's past lost earned income derived from simple mathematical calculations of the differential between the salary for the positions that Plaintiff held during times relevant to the case as compared to the position to which he claim he was entitled. The Court will conduct further inquiry in this regard.

If Plaintiffs seek to continue to rely on Adams for damages calculations, Plaintiffs may attempt to do so but only for past lost earned income. This opportunity for Adams to present his opinions is conditioned on Plaintiffs' adherence to the following procedure. On

---

[17] (...continued)
that interest may be safely earned on the amount that is awarded."). In his supplemental report, having been informed by Plaintiffs' counsel that "it is standard practice to do so and that it is the standard in the industry to discount between 6.5% and 9%," Adams arbitrarily chose a rate of 7.5% to apply "in my future calculations of lost wages." Adams Supplement, at 5.

[18] For instance, he has no reliable basis for assuming that Demeke would have been entitled to investment consultation services or medical reimbursement benefits as a DSD. Moreover, there are far too many unknowns concerning the possibilities of stock options and their value to form the basis of reliable expert opinion. Adams's testimony and opinions on these subjects are too speculative to support recoverable damages.

theories that have been held legally viable, Plaintiffs may present damages figures through Adams for past lost earned income derived through calculations of the salary and bonus differentials for each Plaintiff. Each such calculation shall clearly state the surviving legal claim(s) to which it relates. Adams must produce to GNC these opinion by **April 9, 2007,** in the final report referenced above. In addition, Adams, with this final report, must also provide more detail about his experience, if any, in performing these types of economic damages calculations. Finally, if Adams has opined as a testifying expert on economic damages in other litigation within the last ten years, he must provide GNC copies of his reports and testimony from those cases. Thereafter, the Court will hold an evidentiary hearing on Adams qualifications and the admissibility of his final damages opinions.[19]

The Court notes that Adams will not be permitted to calculate economic losses for Demeke based on a hypothetical promotion from an arbitrarily selected date. There is no indication in Adams's report as to how he selected the date in 2000 that he uses for his calculations.[20] Such rank speculation is inadmissible. *See MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) ("Exercising its gatekeeper role, the district court properly excluded" damages report based on flawed methodology.).

---

[19] If Adams is permitted to testify about his final calculations, he will be subject to cross-examination on his earlier efforts. Adams explains in his supplemental report that some of his opinions changed because he was provided with documents that he previously lacked. Thus, Adams's original opinions may have been unreliable. The Court will evaluate the reliability of Adams's final revised opinions in this regard at the Rule 104 hearing that will be conducted before Adams testifies.

[20] Adams Report, at 9.

## IV.   CONCLUSION AND ORDER

Adams's expert testimony is inadmissible in substantial part because Plaintiffs have not established his qualifications to give the opinions offered, because many were legal conclusions or matters within the jury's experience on which no expert testimony is necessary, and/or because many of the opinions are no longer relevant in light of the Court's summary judgment rulings. The Court will afford Plaintiffs an opportunity to present limited opinions by Adams, on or before **April 9, 2007,** with supporting information as described in this Memorandum and Order**.**  At a hearing outside the presence of the jury during trial, the Court will conduct an evidentiary hearing to determine the admissibility of Adams's final opinions.  In that regard, the Court will assess whether the final opinions are clarifications or corrections of earlier conclusions, whether the final opinions are appropriately supported by the evidence and accepted methodology, and whether Plaintiffs can demonstrate that Adams has the qualifications to opine on the subjects.  Accordingly, it is hereby

**ORDERED** that the Motion to Strike Expert Witness Richard L. Adams [Doc. # 104] is **GRANTED in part** and **DENIED in part** in accordance with this Memorandum and Order.  It is further

**ORDERED** that Plaintiffs shall comply with the schedule and procedures set forth above if Plaintiffs intend to seek to rely on Adams testimony at trial.

**SIGNED** at Houston, Texas, this **28th** day of **March, 2007**.

Nancy F. Atlas
United States District Judge